# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Orlando R.V.V.,

        Petitioner,

v.

Todd Blanche, Acting Attorney General; [1] Markwayne Mullin, Secretary, U.S. Department of Homeland Security; [2] Todd M. Lyons, Acting Director of Immigration and Customs Enforcement; David Easterwood, Acting Director, St. Paul Field Office Immigration and Customs Enforcement; Eric Tollefson, Sheriff, Kandiyohi County,

        Respondents.

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

Civil File No. 26-1903 (MJD/SGE)

---

M. Boulette, Attorney at Law, Counsel for Petitioner.

David W. Fuller, Stephanie Bengford, Assistant United States Attorneys, Counsel for Federal Respondents.

---

[1], [2] On April 2, 2026, Todd Blanche became Acting Attorney General. On March 23, 2026, Markwayne Mullin became Secretary of the Department of Homeland Security. The Court substitutes them as respondents in their official capacities. Fed. R. Civ. P. 25(d).

1

This matter is before the Court on Petitioner Orlando R.V.V.'s petition for writ of habeas corpus under 28 U.S.C. § 2241 filed March 17, 2026.  (Doc. 1.) ("Pet.") Petitioner seeks a writ of habeas corpus requiring, among other things, that Respondents immediately release him from custody or in the alternative, that Respondents provide him a bond hearing under 8 U.S.C. § 1226(a).

I.    FACTS[3]

Petitioner Orlando R.V.V. is a citizen of Venezuela and a resident of Grand Forks, North Dakota who has lived in the United States since June 2022, when he crossed the border near Eagle Pass, Texas without inspection and admission. (Pet. ¶ 14; Doc. 7-3 (Form I-213 (Record of Deportable/Inadmissible Alien attached to Decl. of Angela Miner) at 4 [hereinafter, "I-213"].)  Petitioner was temporarily paroled into the United States due to limited detention space.  (I-213 at 4; Doc. 6 at 2.)

---

[3] The Court will deem admitted any allegations in the Petition that are not contested by Respondents.  See Paula G. v. Bondi, No. 26-CV-410 (JMB/DLM), 2026 WL 146003, at *1 n.2 (D. Minn. Jan. 20, 2026) (citation omitted).  Citations reflect where facts have not been taken from the Petition.

On August 15, 2022, ICE records show that Petitioner "reported to the Enforcement and Removal Operations (ERO) Tampa Sub Office . . . for process and Alternative to Detention evaluation as instructed by [Customs and Border Patrol.]"  (I-213 at 3.)  However, due to "the unprecedented high volume of aliens and limited resources to overcome the volume at ICE/ERO Tampa," personnel were "unable to finish the process" at the time.  (Id.)  "[ICE] mailed out [a] superseded NTA on September 8, 2022," which required Petitioner to appear in immigration court in Orlando, Florida on January 3, 2023 because his parole had expired.  (Id.; Doc. 7-4 at 1; Doc. 6 at 3-4.)  The NTA states that Petitioner is an "alien present in the United States who has not been admitted or paroled."  (Doc. 7-4 at 1.)  The NTA was returned as undeliverable (apparently because Petitioner was already in North Dakota).  (I-213 at 4.)

Petitioner has a credible fear claim, but the I-213 has redacted the explanation of Petitioner's credible fear claim and nothing else in the record fleshes out the claim.  (Id. at 1, 4.)  There is nothing in the record stating whether Petitioner had a credible fear interview when he entered the country.  He does have a pending asylum application and does not have a final order of removal.

3

(Pet. ¶ 15.)  On May 16, 2025, the government filed an NTA for an immigration court hearing in Orlando, Florida on May 18, 2026.  (Doc. 7-1 at 1.)[4]

Petitioner is a beloved family and community member who lives with his girlfriend in Grand Forks, where they moved to have "a normal, safe life."  (Pet. ¶ 16.)  He has a valid work permit, works hard at his job at Amazon, and likes to play soccer with friends and eat with his girlfriend at local restaurants.  (Id.)

On or about 8:45 a.m. on February 26, 2026, ICE agents dressed in plain clothes arrested Petitioner in his driveway without a warrant as he and his girlfriend attempted to backout to go to work.  (Id. ¶ 17; Doc. 6 at 3.)  Petitioner was first taken to "an unknown location in Grand Forks" and was eventually transported almost four hours south to the Kandiyohi County Jail in Wilmar, Minnesota, where he remains detained.  (Pet. ¶ 18.)

---

[4] It is unknown if Petitioner ever received this NTA because it is unknown to what address ICE mailed it.  The I-213 states that ICE was conducting "targeted operations surveillance" on Petitioner's vehicle at the time Petitioner was arrested, which tends to show that ICE knew where Petitioner lived, at least by February 2022.  (Doc. 7-3 at 2.)

## II.   DISCUSSION

A writ of habeas corpus may be granted to a petitioner who demonstrates he is in custody in violation of the Constitution or federal law.  28 U.S.C. § 2241(c)(3).  District courts have jurisdiction to hear habeas challenges to immigration-related detention.  Zadvydas v. Davis, 533 U.S. 678, 687 (2001).

> It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

Id. at 693 (citations omitted).  This "distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."  Id.  The petitioner bears the burden to prove illegal detention by a preponderance of the evidence.  See Belsai D.S. v. Bondi, 810 F. Supp. 3d 1016, 1020 (D. Minn. 2025) (citations omitted).

### A.   Effect of Avila v. Bondi on Petitioner's Claims

On March 25, 2026, the Eighth Circuit decided Avila v. Bondi, — F.4th —, No. 25-3248, 2026 WL 819258 (8th Cir. Mar. 25, 2026), which forecloses Petitioner's statutory and APA claims.  Under Avila, Petitioner is subject to

5

mandatory detention under 8 U.S.C. § 1225(b)(2).  Avila, however, does not

preclude constitutional claims.  The Court therefore turns to Petitioner's due

process arguments.

###### B.   Violation of Petitioner's Due Process Rights

The Court finds that Petitioner's detention under § 1225(b)(2) violates his

procedural due process rights.  See Avila, 2026 WL 819258, at *2-6 (explaining

that petitioners in Petitioner's situation can no longer argue they are being

detained per 8 U.S.C. § 1226 and that they are properly classified as being

detained per § 1225(b)(2)).  The Fifth Amendment provides, in pertinent part,

that "[n]o person shall be deprived of life, liberty, or property, without due

process of law."  U.S. Const. amend. V.  Zadvydas, 533 U.S. at 693

("[T]he Due Process Clause applies to all 'persons' within the United States,

including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent."); A.A.R.P. v. Trump, 605 U.S. 91, 94 (2025) ("[T]he Fifth Amendment

entitles aliens to due process of law in the context of removal proceedings.")

(quoting Trump v. J.G.G., 604 U.S. 670, 673 (2025)).

6

**1.      Banyee v. Garland, 115 F.4th 928 (8th Cir. 2024)**

Although neither party discusses it, the Court would be remiss if it did not address Banyee v. Garland, in which the Eighth Circuit held that a noncitizen permanent resident held in detention for a year pending removal did not implicate due process.  115 F.4th 928, 931 (8th Cir. 2024).   The petitioner in Banyee had been detained pursuant to 8 U.S.C. 1226(c), which permits mandatory detention based on convictions for certain enumerated offenses, and specifically because of his conviction for robbery with a dangerous weapon, a "crime of violence," which qualified as an "aggravated felony" under § 1226(c). Id. at 930 (citing § 1226(c)(1)(B)).  While he appealed the immigration judge's determination that his conviction was a qualifying felony, the petitioner remained detained for over a year.  Id.  He filed a habeas petition, arguing that his continued detention violated due process.  Id. at 930–31.  The Eighth Circuit denied the petition, holding that he was not entitled to a bond hearing pending his deportation and that the length of his detention was not an issue because "what matters is that detention pending deportation 'ha[s] a definite termination point'—deporting or releasing the alien."  Id. at 930-32 (cleaned up) (citing

7

Demore v. Kim, 538 U.S. at 528–29 (drawing the same definite-versus-indefinite distinction); Zadvydas, 533 U.S. at 697).  Further, the Court emphasized that the petitioner himself was the reason that he did not have a final order of removal (i.e., his decision to appeal was the reason for his own detention) and made broad due process pronouncements.  Id. at 933 (stating that "the government can detain an alien for as long as deportation proceedings are still 'pending'") (quoting Demore, 538 U.S. at 527).

**2.      The instant case is distinguishable from Banyee.**

The instant case can be distinguished from Banyee on the facts because Petitioner is not being detained pursuant to § 1226(c); Selvin Adonay E.M. v. Noem, —F. Supp. 3d—, No. 25-cv-3975 (SRN/DTS), 2025 WL 3157839, at *9 (D. Minn. Nov. 12, 2025) (distinguishing on the facts).  Rather, Petitioner is being detained pursuant to § 1225(b)(2), a materially different statute governing applicants for admission to the country, not individuals already deemed removable based on convictions for serious criminal offenses.  Although both statutes provide for mandatory detention under certain circumstances, the statutory schemes at issue predicate mandatory detention on considerably

different factual circumstances.  For instance, in enacting § 1226(c), Congress made specific, categorical judgments about the dangerousness and flight risks posed by noncitizens convicted of certain enumerated offenses.  The situations leading to detention of the petitioner in <u>Banyee</u> as opposed to the Petitioner here highlight these important differences: one was convicted of an aggravated felony while the other one has been law abiding since 2022 and is currently exercising his statutory right to seek asylum.

Petitioner also has an unresolved asylum claim.  The I-213 states that Petitioner had a credible fear claim, but not that any decision was made on the claim.  (I-213 at 1, 4.)  The September 8, 2022 NTA that was mailed to a Florida address and was returned to ICE in October 2022 did <u>not</u> have the box checked that states, "This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture."  (Doc. 7-4 at 1.)  Of course, Petitioner never received this NTA because he was not in Florida to receive it.  Petitioner, however, took steps to apply for asylum because he has a work permit.  (Pet. ¶ 16.)  An asylum seeker cannot apply for a work permit until 150 days after he has submitted his asylum application.  <u>See</u>

9

https://www.uscis.gov/humanitarian/ refugees-and-asylum/asylum (Permission

to Work in the United States menu) (last visited Apr. 1, 2026).  Thus,

notwithstanding any ambiguity over what occurred at the border regarding

credible fear, Petitioner here is in the early stages of developing his asylum claim

while the petitioner in Banyee was near the end of the process and was in

removal proceedings.  Thus, this case is factually distinguishable from Banyee.

Finally, there is no reason for the Court to read the Eighth Circuit's broad

due process pronouncements in Banyee as anything but cabined to the statutory

and factual context in which they arose.  The Banyee court's analysis is rooted in

detention under § 1226(c), and its reliance on Supreme Court precedent

reinforces that limited scope.  Demore, for example, similarly addressed

mandatory detention tied to certain criminal convictions under § 1226(c), while

Zadvydas considered post-removal-detention orders and interpretation of the

post-removal detention statute, 8 U.S.C. § 1231(a)(6).  See Demore, 538 U.S. 510;

Zadvydas, 533 U.S. 678.  These cases, then, have not "already done whatever

balancing is necessary."  See Banyee, 115 F.4th at 933.  To the contrary,

Petitioner's detention arises under a separate statutory provision with a different

factual predicate, and the Court must therefore consider what due process is required for his individual claim.

### 3.     Merits of Petitioner's Due Process Claim

The circumstances and nature of a given case may affect various aspects of the due process analysis. The analysis may differ significantly depending on the location of a noncitizen's encounter with immigration authorities—whether at the border or in close proximity thereto versus within the interior of the United States. It may be affected on whether the noncitizen has had prior encounters with immigration authorities and, if so, whether the noncitizen had been granted some sort of release previously. Immigration authorities, moreover, may release a noncitizen from detention in several ways—through various forms of parole, an order of supervision, or even on the noncitizen's own recognizance. Whether or not re-detention is at issue, the life that the noncitizen has built and developed within the United States impacts the due process analysis.

Once a noncitizen has been provided a pathway for release and entry into the United States subject to whatever terms are imposed, the release may create a cognizable liberty interest protected by the Fifth Amendment.  See, e.g., Zhu v. Genalo, 798 F. Supp. 3d 400, 408 (S.D.N.Y. 2025).  Not only do criminal parolees have a liberty interest "that parole will be revoked only if [the parolee] fails to live up to the parole conditions," Morrissey v. Brewer, 408 U.S. 471, 482 (1972), but civil detention further limits the circumstances justifying detention without violating due process, see Zadvydas, 533 U.S. at 690.

Due process protection remains even if government authorities have discretion to revoke supervision.  Zhu, 798 F. Supp. 3d at 408.

11

> Detention without notice or explanation as required by regulation likewise "involves Petitioner's protected interest in his continued liberty." Id.  This differs from a challenge to the general discretionary authority that might be available to revoke the release. Id.
>
> Further, even in circumstances lacking a prior detention, release, and re-detention, noncitizens already in the country who have "established a life here—albeit without authorization," possess "a strong liberty interest in their freedom from detention." Martinez v. Noem, No. EP-25-CV-430-KC, 2025 WL 2965859, at *4 (W.D. Tex. Oct. 21, 2025).  This is "consistent with the longstanding principle that due process applies to those who are present in the interior of the United States, regardless of their citizenship status." Id.

Rodriguez Brizuela v. Noem, No. 5:26-CV-0279-JKP, 2026 WL 752257, at *5 (W.D. Tex. Mar. 12, 2026).

"Once it is determined that due process applies, the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972); Bus. Commc'ns, Inc. v. U.S. Dep't of Educ., 739 F.3d 374, 380 (8th Cir. 2013).  The flexibility of due process "calls for such procedural protections as the particular situation demands."  Morrissey, 408 U.S. at 481.  Thus, "identification of the specific dictates of due process generally requires consideration of three distinct factors." Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

12

### a. The <u>Mathews v. Eldridge</u> Factors

To determine whether a detainee's due process rights have been violated,

courts apply a three-part balancing test that weighs the following:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Governments' interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

<u>Id.</u> (numbering added).

Respondents assert that because 8 U.S.C. § 1225(b)(2) applies to this case

and detention is mandatory, Petitioner's due process claims should be denied.

### i.      First <u>Mathews</u> Factor

The Supreme Court has referred to the private interest in being free from

physical detention as the "most elemental of liberty interests." <u>Hamdi v.</u>

<u>Rumsfield</u>, 542 U.S. 507, 529 (2004); <u>Zadvydas</u>, 533 U.S. at 690 ("Freedom from

imprisonment—from government custody, detention, or other forms of physical

restraint—lies at the heart of the liberty that [the Fifth Amendment's Due

Process] Clause protects."). This is true even if the Court considers that after his

temporary parole expired, Petitioner reverted to a status as "an alien who

13

entered without inspection," as characterized by ICE.  (Doc. 6 at 2, 4 (citing 8

U.S.C. § (d)(5)(A); Jennings v. Rodriguez, 583 U.S. 281, 288 (2018) (noting that

"when the purpose of the parole has been served, 'the alien shall forthwith

return or be returned to the custody from which he was paroled and thereafter

his case shall continue to be dealt with in the same manner as that of any other

applicant for admission to the United States'") (quoting 8 U.S.C. § (d)(5)(A)).)

Petitioner is currently detained in the Kandiyohi County Jail, in circumstances

that very likely mirror "criminal incarceration."  See Gunaydin v. Trump, 784 F.

Supp. 3d 1175, 1187 (D. Minn. 2025) ("[w]hen assessing [the first factor], courts

consider the conditions under which detainees are currently held, including

whether a detainee is held in conditions indistinguishable from criminal

incarceration") (citations omitted).

Further, Petitioner has also identified significant private interests affected

by his ongoing detention.  Since moving to North Dakota, Petitioner has gotten a

job, developed a quiet life, and enjoys simple pleasures with his girlfriend and

friends.  (Pet. ¶ 16.)  By his continued detention, he is undoubtedly experiencing

the deprivations of incarceration, like the loss of companionship and income.

Therefore, considering both current detention circumstances and ties to the community, the first <u>Mathews</u> factor favors Petitioner.

### ii.    Second <u>Mathews</u> Factor

The second <u>Mathews</u> factor requires the Court to consider the risk of an erroneous deprivation of Petitioner's liberty as well as consider "the degree to which additional or substitute procedural safeguards could ameliorate the risks of erroneous deprivation." <u>Selvin</u>, 2025 WL 3157839, at *9 (citing <u>Mathews</u>, 424 U.S. at 335).

Although Petitioner was temporarily paroled into the United States on or about June 30, 2022 (Docs. I-213 at 4; 6 at 2.), that parole was revoked or allowed to expire because the September 8, 2022 NTA stated that Petitioner was "an alien present in the United States who had not been admitted or paroled." (Doc. 7-4 at 1.) ICE states that after parole expired, Petitioner reverted to his original status as an alien who entered without inspection, which is what triggered the September 2022 NTA. (Doc. 6 at 2-3.)

However, the <u>fact</u> remains that Petitioner was previously released, which "in and of itself reflects a determination that the individual is neither a flight risk nor a danger to the community," and also means "there is a very high risk of

15

erroneous deprivation of liberty absent an individualized custody determination." Rodriguez Brizuela, 2026 WL 752257, at *6 (cleaned up); Juan C.R.R. v. Bondi, et al., No. 26-01282 (MJD/DJF), 2026 WL 752462, at *4 (D. Minn. Mar. 17, 2026) (adopting R&R in part and reasoning that release was appropriate when the petitioner was previously released on bond and the government provided no evidence the petitioner's circumstances had materially changed).

Although Petitioner was "temporarily paroled" due to overcrowding, he was not "paroled after inspection by an Immigration Officer." However, without any indication that Petitioner was subject to conditions during his temporary parole, it appears to the Court that his 2022 release due to overcrowding was akin to release on his own recognizance. See Guerra-Miranda v. Bondi, No. EP-26-CV-00028-KC (W.D. Tex. Jan. 21, 2026) (calling the variation between the parole after inspection and release on recognizance "a distinction without a difference"). What matters is that Petitioner was released based presumably on a determination that he was not a danger to the community or a flight risk. Petitioner has no criminal record and he attempted to attend his first immigration hearing, although the court did have time for his case. After that,

16

Petitioner apparently missed the NTA for the rescheduled hearing.  However, there is nothing before the Court stating that Petitioner was required to tell ICE about address changes (although common sense tells the Court that this is likely true).  A decision to release a petitioner "creates 'an implicit promise,' upon which that individual may rely, that their liberty "will be revoked only if [they] fail[ ] to live up to the . . . conditions [of release]." Pinchi v. Noem, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) (quoting Morrissey, 408 U.S. at 482).  From the record before the Court, it does not appear that Petitioner failed to comply with any conditions of his release.  Despite being told to provide "[s]uch affidavits and exhibits as are needed to establish the lawfulness and correct duration of Petitioner's detention in light of the issues raised in the habeas petition" (Doc. 4 ¶ 3), Respondents have not told the Court what conditions Petitioner needed to comply with or what conditions he violated while on release.  See Selvin, 2025 WL 3157839, at *9 (holding that when respondents neither identified any burdens nor suggested that Petitioner would be denied bond if he were afforded a hearing, this factor weighed in favor of the petitioner) (citing  Barrios v. Shepley, No. 1:25-cv-00406-JAW, 2025 WL 2772579, at *11 (D. Me. Sept. 29, 2025) (noting a

"large" risk of erroneous deprivation where respondents failed to show that petitioner presented any risk of flight or risk to public safety)).

Even if the Court considers Petitioner a noncitizen present in the United States who had not been admitted or paroled, he suffers a substantial risk of erroneous deprivation of liberty in this situation. "[A] substantial risk of erroneous deprivation of liberty exists" for "a noncitizen who was arrested within the United States and lacks any prior release by immigration authorities, but who has established a life here in the United States" when he is detained without bond. Rodriguez Brizuela, 2026 WL 752257, at *6 (citation omitted).

This factor also weighs in favor of Petitioner.

### iii.    Third Mathews Factor

"Finally, the third Mathews factor—the government interest—requires the Court to weigh the private interests at stake and the risk of erroneous deprivation of those interests against Respondents' interests in persisting with mandatory detention and the burdens of additional or substitute requirements." Selvin, 2025 WL 3157839, at *9 (citing Mathews, 424 U.S. at 335). Ensuring that persons subject to removal do not commit crimes or evade law enforcement is a significant governmental interest. Id.

18

Here, Petitioner established a life in this country, "albeit without authorization," at least after his parole expired. He has been in this country for approximately three-and-a-half years; has work authorization, a job, a girlfriend, friends; and a quiet law-abiding life in Grand Forks. Thus, Petitioner has "established a significant presence in the United States that requires due process protection." Rodriguez Brizuela, 2026 WL 752257, at *6. In addition, Petitioner not only encountered ICE when he first entered the country and was paroled, although temporarily, he also attempted to interact with ICE in Florida in August 2022 but was rebuffed due to overloaded dockets. Thereafter, Petitioner did not go underground or hide from authorities for the next three years. He was obviously on Immigration's radar because he applied for asylum and a work permit. The Court assumes that Immigration knew where to send this document and where to reach Petitioner with information regarding his asylum case and/or any changes to his work authorization. The evidence does not establish that Petitioner was trying to evade authorities despite missing the check-in noticed in the NAT mailed to Florida when he had already moved to North Dakota.

19

Respondents have not proffered any argument in response to Petitioner's due process challenge.  Typically, the Court is not in the business of making the parties' arguments for them; however, the Court does recognize that the government maintains an interest in protecting the community and ensuring that noncitizens do not become a flight risk. See, e.g., Selvin, 2025 WL 3157839, at *9. The Court is persuaded by Alvarez-Rico v. Noem, where, in the aftermath of the Fifth Circuit's decision in Buenrostro-Mendez v. Bondi, No. 25-20496, 2026 WL 323330 (5th Cir. Feb. 6, 2026), the Southern District of Texas reasoned that:

> [T]his [government] interest is not served by summarily re-detaining noncitizen "applicants for admission" whom the government previously determined were not flight risks or dangers to the community without a showing of changed circumstances. Indeed, given the high costs of detention, the fiscal and administrative burdens of providing noncitizens in these circumstances with some form of hearing pales in comparison with the burdens of re-detaining thousands of noncitizens who were previously released on recognizance.

No. 4:26-CV-00729, 2026 WL 522322, at *6 (S.D. Tex. Feb. 25, 2026).  Therefore, the final Mathews factor does not weigh significantly enough in the government's favor to continue Petitioner's detention without a bond hearing.

 Granting Petitioner a bond hearing will give him and the Immigration Court an opportunity to hear Respondents' explanation as to what circumstances

20

now require Petitioner's detention when he has no criminal record, has not tried to hide from Immigration, and has lived in North Dakota for three years with his girlfriend and where he has a job, so therefore poses no threat to the community and no flight risk.  Immigration/ICE has known his whereabouts all or most of the past three-and-a-half years due to Petitioner's asylum application.  This "due process safeguard will reduce the risk of erroneous deprivation without imposing significant burdens on the Government."  Selvin, 2025 WL 3157839, at *9-10 (granting hearing under § 1226(a)).  This factor also weighs in Petitioner's favor.

### b.  Conclusion on the Mathews v. Eldridge Factors

The above analysis leaves the Court with but one possible conclusion: the factors all weigh in Petitioner's favor.  Petitioner's Petition for a Writ of Habeas Corpus will be granted based on violations of his procedural due process rights. The appropriate remedy is the opportunity to be heard, which, in this case means a bond hearing.

### C.   Jurisdictional Conflict Between Two Immigration Courts

This case presents an interesting issue in so far as Petitioner is now under the jurisdiction of the Fort Snelling Immigration Court and is also apparently still

under the jurisdiction of the Orlando Immigration Court.  (See Doc. 7-1.)  The Orlando Immigration Court has noticed an in-person hearing for May 18, 2026. (Id.)  As the Order, below, shows, the Court orders a bond hearing before the Fort Snelling Immigration Court prior to the hearing in Orlando.  Although the Court does not claim to be an expert on immigration court jurisdictional issues, it seems that it would be most unusual for a noncitizen to be subject to the simultaneous jurisdiction of two courts.

Accordingly, the Court will order the parties to immediately meet and confer regarding a motion for a change of venue pursuant to 8 C.F.R. § 1003.20. Although the Court does not represent that this resource is comprehensive, the parties may find the following helpful:  MaryBeth Keller, Chief Immigration Judge, Operating Policies and Procedures Memorandum 18-01: Change of Venue (Jan. 17, 2018), available at https://www.justice.gov/eoir/page/file/1026726/ download (last visited April 8, 2026).

## III.   ORDER

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

22

1. Petitioner's petition for writ of habeas corpus **[Doc. 1]** is **GRANTED in part as follows:**

   a. Petitioner's detention under § 1225(b)(2) violates his procedural due process rights;

   b. Respondents are ordered to provide Petitioner with a bond hearing no later than one week after the issuance of this Order; and

   c. If a bond hearing takes place that results in Petitioner's release, Respondents are ordered to:

      i. Release Petitioner into Minnesota;

      ii. At a safe time and place communicated at least two (2) hours in advance to Petitioner's counsel; and

      iii. With all of Petitioner's personal effects in Respondents' possession, such as Petitioner's driver's license, immigration papers, passport, cell phone, keys;

   d. If a bond hearing does not take place within one week, Respondents are ordered to immediately release Petitioner from custody into Minnesota with the same conditions of release described in 1(c); and

   e. Within 48 hours of the conclusion of the bond hearing or Respondents' decision to release Petitioner from custody, Respondents must file a status report with the Court detailing the results of the Bond Hearing or its actions related to release;  and

23

    f.  If relevant, Petitioner will have seven (7) days to file a response to this status report and to ask for any appropriate remedy the Court is legally able to grant.

2. Respondents are ordered to immediately meet and confer regarding a motion to transfer venue to this jurisdiction where Petitioner has an on-going asylum case and community ties and, at least to inquire as to how to quash the NTA for the May 18, 2026 hearing **[Doc. 7-1]** while awaiting an order on any motion to transfer venue.

3. Within one (1) week of the date of this Order, the parties shall file a joint status report documenting progress on/results of the actions taken in No. 2. of this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  April 28, 2026                    s/Michael J. Davis
                                            Michael J. Davis
                                            United States District Court